**In re Hank CLARKSON a/k/a Henry J. Clarkson and Theresa Clarkson, Debtors.**

**Hank CLARKSON a/k/a Henry J. Clarkson and Theresa Clarkson, Plaintiffs,**

v.

**Juan Carlos DeCACERES, Defendant.**

**Bankruptcy No. 88–14260S.
Adv. No. 89–0270S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 21, 1989.

Michael Karasik, Bala Cynwyd, Pa., for plaintiffs-debtors.

Michael E. Garner, Philadelphia, Pa., for defendant.

Stephen Raslavich, Philadelphia, Pa., trustee.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The joint bankruptcy case underlying this proceeding was commenced under Chapter 7 of the Bankruptcy Code on December 5, 1988, by the Debtors, HANK CLARKSON a/k/a HENRY J. CLARKSON and THERESA CLARKSON. The Debtors are married and the parents of two young children, who were present with the Debtors in court and appear to be about four and eight years of age, respectively.

2. Almost immediately after the filing of the case, the Debtors, on December 6, 1988, filed an expedited motion pursuant to 11 U.S.C. § 522(f)(1) seeking to avoid any judicial lien which the Defendant, JUAN CARLOS DeCACERES, their former landlord, had obtained against their personal property left behind in their former residence at 1915 East Clearfield Street, First Floor, Philadelphia, Pennsylvania 19134, and to obtain an order requiring the Defendant to return the said property.

3. After a hearing of December 8, 1988, on this motion, attended only by the Debtors and their counsel, we entered an Order of same date granting the motion and directing the Defendant to allow the Debtors to recover their property; however, we also provided the Defendant with an opportunity to answer the motion on or before December 23, 1988, and be accorded a rehearing on the matter if an answer were filed.

4. No answer was filed to the motion by the Defendant, and there were in fact no filings relevant to this controversy thereafter until March 28, 1989, when the Debtors, represented by new counsel, commenced the instant adversary proceeding against the Defendant. In this proceeding, they sought the following elements of damages: (1) the value of certain personal property allegedly never returned to them despite our Order of December 8, 1988; (2) punitive damages in light of the alleged "outrageous conduct" of the Defendant, including contempt of our said Order of December 8, 1988; and (3) treble damages and attorneys' fees in light of the Defendant's alleged violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (this is a law prohibiting *u* nfair and *d* eceptive *a* cts and *p* ractices, and is hence referred to hereinafter as "UDAP").

5. After several continuances, the matter was listed for trial on August 22, 1989, on a "must-be-tried" basis, and was in fact heard on that date.

6. The Debtors called the Defendant as of cross-examination as their first witness. In addition to hearing and language problems, the Defendant exhibited a highly emotional and hyperbolic demeanor which did not inspire confidence in his credibility. The only other witness called was the Wife–Debtor (hereinafter referred to as "the Wife"), who exhibited a calm and understated demeanor which was considerably more convincing.

7. Both witnesses agreed that the Debtors moved into the Defendant's premises in· July, 1988, and thereafter failed to make the rental payments of $390 monthly, as per the lease. The Wife claimed that this was because the Debtors were protesting lack of certain repairs necessary to the premises. Consequently, after providing the prerequisite written notice to quit, the Defendant filed a landlord-tenant proceeding in Philadelphia Municipal Court which, after a hearing of September 27, 1988, resulted in a judgment in his favor for back rent and possession.

8. The Wife testified that, in September, 1988, prior to the court hearing, the Defendant called the Debtors three or four times weekly late at approximately 11:00 P.M. demanding that they pay the rent. The Defendant testified that he did not call the Debtors because they told him that they had no telephone. However, in the course of testimony regarding his communications with the Debtors, the Defendant stated that he had called the Debtors to arrange for plumbing repairs, and then attempted to reconcile this with his earlier testimony by stating that he had called the Debtors through the Wife's sister. Given the relative demeanor of the parties and the apparent inconsistency of the Defendant's testimony, we credit the testimony of the Wife that the Defendant called the Debtors after 9:00 P.M. on numerous occasions to attempt to collect rent.

9. The Wife testified that she negotiated with the Defendant to cure the rent delinquency by paying installments of $500 monthly. However, although she claimed that the Defendant had agreed to accept this figure, the Wife testified that her calls to inform the Defendant that she had the first $500 payment were intercepted by the Defendant's wife, who failed to relay them to the Defendant because she sought to have the Debtors evicted.

10. On November 23, 1988, the Defendant had the Debtors physically evicted on the basis of execution upon his judgment for possession by a court official, who advised the Debtors that they were obliged to leave most of their personal property behind at the premises. The Wife testified that, at the time of the eviction, the Defendant stated that all of the Debtors' goods belonged to him and indicated that he would dispose of it himself, despite the

court official's statements that he could not do so. The Defendant testified that the court official told him that he could sell the property. We again credit the Wife's testimony, particularly since it is legally correct and we believe that the court official would not have misrepresented the law.

11. The Debtors attempted to call the Defendant on the evening of November 23, 1988, and November 25, 1988, to arrange to return to the premises, but the Wife testified that the Defendant's wife intervened and asserted that the Defendant would not accept their offer, and that the Defendant again threatened to sell the Debtors' property.

12. The Defendant had admitted into evidence a copy of a form entitled "Procedure Municipal Court Writs of Execution" and a receipt dated November 25, 1988, which indicated that the Defendant filed a writ to execute upon the Debtors' personal property on November 25, 1988.[1]

13. The Defendant testified that the Husband–Debtor (hereinafter "the Husband") called him on the evening of November 25, 1988, and threatened, among other things, to burn the rented premises down because the Debtors had been evicted. Allegedly as a result, the Defendant testified that he, his wife, and his 13–year–old son decided to stay in the premises on the night of November 25–26, 1988, to "protect" it. When there, the Defendant claimed that he found "drug paraphernalia" and pornographic books and that, around 2:00 A.M., an alleged friend of the Debtors, Ron Litistanski, broke into the premises and damaged it. Although the Husband's failure to testify causes us to believe that he did make a threatening call to the Defendant, the remainder of this story is patently incredible. We do not understand why the Defendant would bring his family into the premises if he believed that violence would occur there. There was, apparently, damage to the

premises by a vandal, possibly Litistanski, but there is no more evidence linking this damage to the Debtors than to the Defendant.

14. In the following week, the Debtors consulted counsel at Community Legal Services, Inc. (hereinafter "CLS"), an agency which provides free legal services to low-income persons in civil cases, to attempt to regain possession of their personal property. After an unsuccessful attempt to meet with the Defendant to arrange to recover their property, the Debtors, on advice of prior CLS counsel, filed the proceedings described in Findings of Fact 2 and 3, pages 267–68 *supra*.

15. When the Debtors gained entry to the premises pursuant to our Order of December 8, 1988, they observed that the premises had been vandalized, and they were only able to recover only a portion of their personal property.

16. The Defendant admitted that he had sold the several relatively valuable items of property of the Debtors left in the premises, such as their two televisions, VCR, vacuum cleaner, and clocks, mostly to co-workers at the Southeastern Pennsylvania Transportation Authority (hereinafter "SEPTA"), where he was employed as a repairman. The Defendant justified his conduct, which at least his counsel acknowledged as wrongful, on the following bases: (1) He and his family needed money to eat; (2) He believed that the Debtors had furnished their premises lavishly and were therefore maliciously depriving him of his rent; and (3) The court official had authorized him to do so. As we indicated at Finding of Fact 9, page 268 *supra*, we disbelieve the third basis and the other two reasons given are clearly exaggerations.

17. In his initial testimony, the Defendant stated that he continued selling the Debtors' property through New Year's Day, 1989, and "could have" made some of

---

**1.** This documentary evidence may not have been sufficient to establish the validity of the execution and the existence of the Defendant's lien on the Debtors' personal property. *See In re Railroad Dynamics, Inc.,* 97 B.R. 239, 244–45 (Bankr.E.D.Pa.1989). Thus, it is not totally clear that the Defendant had a valid lien against the Debtors' property. However, even if he had, the lien was avoided by means of the Debtors' motion pursuant to 11 U.S.C. § 522(f)(1) described at Findings of Fact 2–4, pages 267–68 *supra*.

the sales in January, 1989. At this time, he insisted that he had received no notice of the court orders until late December, 1988, because the Debtors' former counsel had sent notices and court orders to him postage due. When confronted with the fact that the court itself had sent orders to his post-office box immediately after their entry, the Defendant then attempted to claim (1) that he did not understand the orders; and (2) that all of his sales of the Debtors' property had preceded his receipt of the court orders scheduling the hearing and granting the Debtors relief. We disbelieve the latter version of the facts because of its inconsistency with the Defendant's earlier testimony. We find that the Defendant received our Order of December 8, 1988, and understood that it prohibited him from any further possession or sales of the Debtors' property, but that he continued to effect sales of the said property in willful violation of our Order of December 8, 1988.

18. The Wife credibly testified that the following items of personal property, valued at the following respective sums, were left in the premises on November 23, 1988, but were never recovered by the Debtors:

| | |
|---|---:|
| Television 13" color—Samsung | $250.00 |
| 19" color—Sharp | 325.00 |
| VCR—Magnavox | 410.00 |
| Stereo—Technics receiver, BSR turntable, Harvard speakers | 400.00 |
| Atari 2600 | 50.00 |
| 2 portable radios | 150.00 |
| Alarm clock radio—sound design | 15.00 |
| Fisher Price record player | 30.00 |
| Room divider | 120.00 |
| Proctor Silex coffee maker | 35.00 |
| Knick knack shelf | 30.00 |
| Toaster | 15.00 |
| Electric can opener | 15.00 |
| Toys | 75.00 |
| Clothes | 75.00 |
| Food | 40.00 |
| Sheets | 100.00 |
| Towels | 100.00 |
| Blankets | 40.00 |
| Silverware | 45.00 |
| 2 wall clocks | 30.00 |
| Knick knacks | 75.00 |
| Leather jacket (man's) | 200.00 |
| Penny bank | 25.00 |
| Bedroom lamps | 30.00 |
| Hamper | 25.00 |
| Lunch mate cooler (Igloo) | 15.00 |
| Record albums | 100.00 |
| VCR tapes | 40.00 |
| Cook books (3) | 30.00 |
| TOTAL | $2,890.00 |

## B. CONCLUSIONS OF LAW

1. The parties apparently assumed that this court had jurisdiction to hear and decide this proceeding, and the Defendant admitted the Debtors' allegation that this court has jurisdiction, while not commenting on the Debtors' allegation that it was a core proceeding. *See* Bankruptcy Rule 7012(b). In any event, however, we believe that this matter is a core proceeding because it seeks damages for alleged conduct affecting property of the Debtors' estate which occurred principally post-petition, *see, e.g., In re Arnold Print Works, Inc.,* 815 F.2d 165, 168–71 (1st Cir.1987); and *In re Jackson,* 90 B.R. 126, 128–31 (Bankr.E.

D.Pa.1988), and because it relates to subject matter (disposition of the Debtors' personalty) which was clearly property of the Debtors' estate and concerning which this court had entered an Order on December 8, 1988, contempt of which is alleged herein. *Cf. In re B. Cohen & Sons Caterers, Inc.,* 97 B.R. 808, 813 (Bankr.E.D.Pa.1989) (action to recover damages under 11 U.S.C. § 362(h) is a core proceeding). We therefore conclude that we have jurisdiction to both hear and decide this proceeding. 28 U.S.C. § 157(b)(1).

2. Assuming *arguendo* that there was a valid levy against the Debtors' property by a court official,[2] the Defendant had no right to personally retain possession of that property or to sell it. *See B. Cohen, supra,* 97 B.R. at 814–16.

3. Since the Defendant took possession of the Debtors' personal property left therein when the Debtors were forcibly removed from the Defendant's premises, the Defendant held the Debtors' personal property which was left behind when they were evicted from the premises as a bailee. As such, the Defendant was obliged to exercise reasonable care to preserve this property. *See In re Bell, Bell v. Philadelphia Housing Authority,* Bankr. No. 89–10331S, Adv. No. 89–0571S, slip op. at 7–8, 1989 WL 100193 (Aug. 28, 1989); *B. Cohen, supra,* 97 B.R. at 814; and *Christensen v. Hoover,* 643 P.2d 525, 518 (Colo. 1982) (en banc).

4. As a party exercising purported rights of a lienholder which has no basis in law, *see B. Cohen, supra,* 97 B.R. at 815, and by selling same in gross violation of his duty as a bailee of the Debtors' property, *id.* at 814, the Defendant was guilty of conversion of the Debtors' property, and is liable to the Debtors for the value of same.

5. The value placed upon the property which the Defendant converted by the Wife, *i.e.,* $2,890, was, if anything, conservative, as it included a substantial portion of the personal property of a family of four. *Compare Bell, supra,* slip op. at 6–7, 9 (court expresses skepticism of $2,066 alleged value of a portion of the personal property of single 70–year–old man living in public housing whose sole income was Social Security benefits at $2,066; property valued by the court at $500).[3] The Defendant is therefore liable to the Debtors for actual damages for conversion of their missing personal property, which had a value of at least $2,890.

6. Although the Debtors, in their Brief, claim to have suffered actual damages of $4,825, they have failed to establish damages of more than $2,890 in the record of this case. Therefore, their actual damages are limited to $2,890.00.

7. UDAP applies to landlord-tenant matters, and allows a tenant to invoke that law's civil-remedy provision, 73 P.S. § 201–9.2(a). *See In re Clark,* 96 B.R. 569, 580 (Bankr.E.D.Pa.1989); and *In re Aponte,* 82 B.R. 738, 746–47 (Bankr.E.D. Pa.1988). *Cf. In re Smith,* 866 F.2d 576, 580–86 (3d Cir.1989) (supports a broad reading of scope of UDAP).

8. UDAP applies to violations of the Pennsylvania Debt Collection Trade Practice Regulations, 37 PA. CODE § 303.1, *et seq.* (hereinafter "DCTPR") in a landlord-tenant context. *Aponte, supra,* 82 B.R. at 746–47.

9. The Defendant's conduct in selling the Debtors' property amounted to willful conversion of the Debtors' property, which constitutes fraudulent conduct creating a likelihood of confusion or misunder-

---

2. *But see* page 269 n. 1 *supra.*

3. The Defendant attempts to argue, in his Brief, that these figures should be scaled down because the Debtors included somewhat lower figures on their Schedules. However, the Schedules were not admitted into the record, as they were in *B. Cohen, supra,* 97 B.R. at 811, 816–17. *See In re Aughenbaugh,* 125 F.2d 887, 889 (3d Cir.1942); *In re Nicolet, Inc.,* 80 B.R. 733, 742–44

(Bankr.E.D.Pa.1987); and *In re Corbett,* 80 B.R. 32, 35 n. 3 (Bankr.E.D.Pa.1987) (Schedules and other filings in main bankruptcy case do not automatically become part of the record of a proceeding or contested matter). Moreover, the discrepancies alleged here are not nearly so substantial as in *B. Cohen, supra* (debtor presented testimony that goods listed on the Debtor's Schedules as valued at $16,500 were worth over $500,000).

standing, *see* 73 P.S. § 201–2(4)(xvii), and constitutes violations of the following provisions of the DCTPR: 37 PA.CODE §§ 303.3(3) (falsely representing character of a debt); 303.3(11) (falsely representing that a debt resulted in a legal seizure, attachment, or sale); 303.3(14) (representing that an action which cannot legally be taken could be taken); 303.3(22) (using unlawful action to harm the property of another); and 303.3(27) (engaging in conduct which oppressed and abused the Debtors in collection of debts).

10. The Defendant's efforts to collect his rent by means of frequent, night-time telephone calls to the Debtors also violated the following provisions of the DCTPR: 37 PA.CODE § 303.3(24) (placing telephone calls after 9:00 P.M.); and § 303.4(2) (multiple calls to collect a debt within a seven-day period).[4]

11. Furthermore, the conduct of the Defendant is marked by the same sort of behavior evincing a contempt of prior orders of this court and a lack of concern to the rights of tenants including families with children which pervaded the *Aponte* factual situation. *See* 82 B.R. at 740–42, 744–45.[5]

12. The Debtors are entitled to recover three times their actual damages in light of the Defendant's UDAP violations, or $8,670.00.[6]

13. The Debtors' counsel is entitled to reasonable attorneys' fees in light of the successful prosecution of an action alleging violations of UDAP. *See, e.g., Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333, 336 (E.D.Pa.1988); and *Aponte, supra,* 82 B.R. at 747. The Debtors' Brief included Verified Time Records requesting attorneys' fees of $2,220.00 for their counsel. The Defendant did not take specific issue with these figures and we find them reasonable.

### C. ORDER

AND NOW, this 21st day of September, 1989, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtors HANK CLARKSON a/k/a HENRY J. CLARKSON and THERESA CLARKSON, and against the Defendant, JUAN CARLOS DeCACERES, in the amount of $8,670.00.

2. In addition, the Debtors and their counsel, MICHAEL KARASIK, ESQUIRE, are awarded reasonable attorneys' fees of $2,220 against the aforesaid Defendant.

---

**4.** The Debtors did not provide any proof regarding their actual damages from this conduct, and therefore we are unable to add any sums from this harassment to the damages awarded. *See In re Jungkurth,* 74 B.R. 323, 335–36 (Bankr.E.D. Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988) ("recovery" resulting from improper collection practices was limited to setoff against the debt because the precise amount of damages was not quantified). *But cf. Crossley v. Lieberman,* 868 F.2d 566, 572–73 (3d Cir.1989), *aff'g,* 90 B.R. 682, 698–99 (E.D.Pa.1988) (damages of $2,000 awarded upon evidence of emotional distress of aged debtor). Here, no evidence of even emotional distress of the Debtors was established.

**5.** The Debtors here did not allege any violation of 11 U.S.C. § 362(a) nor, consequently, did they make any claim under 11 U.S.C. § 362(h), as did the *Aponte* debtors. 82 B.R. at 739–46. They have failed to quantify any damages ex-

cept the loss of their personal property. We can and therefore will base our award of damages only upon the damages flowing from the Debtors' loss of personal property.

**6.** The Debtors, in their Brief, seem to suggest that they should recover compensatory damages and then, in addition, three times *those* damages for the violations of UDAP. This appears to us to be a request for quadruple damages, and this is not the measure utilized in either *Clark, supra,* 96 B.R. at 583, or the calculations as to this aspect of damages in even the aggravated circumstances in *Aponte,* 82 B.R. at 747. We note that, in their Brief, the Debtors do not appear to request any additional sums for emotional distress or punitive damages. These aggravated circumstances here are, of course, partially taken into consideration in our exercising our discretion to treble the Debtors' damages, the maximum allowable under 73 P.S. § 201–9.2(a).